AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

United States of America )
v. )
JOEL LESTER )  Case No. 12-8122-AEV
)
)
)

FILED by _____ D.C.

MAR 3 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   January 23, 2012   in the county of   Palm Beach   in the   Southern   District of   Florida  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), 21 U.S.C. § 813, 21 U.S.C. § 801(32)(A), 21 U.S.C. § 841(b)(1)(D) | Possessing with intent to distribute a controlled substance analog. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Eric D. Gilbert
Printed name and title

Sworn to before me and signed in my presence.

Date:   03/30/2012

_____
Judge's signature

City and state:   West Palm Beach, Florida

Ann E. Vitunac, United States Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Eric D. Gilbert, Task Force Officer of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, depose and say:

1. I make this affidavit in support of criminal complaint charging JOEL LESTER with knowingly and intentionally distributing a mixture or substance containing AM2201 and JWH-122, considered controlled substance analogs of JWH-018 as defined in 21 U.S.C. § 802(32)(A), knowing that the substance was intended for human consumption as provided in 21 U.S.C. § 813, in violation of Title 21, United States Code, Section 841(a)(1).

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested anticipatory search warrant and does not set forth all of my knowledge about this matter nor does it set forth all knowledge held by federal and local law enforcement agencies concerning this matter.

## AGENT BACKGROUND

3. I am a Task Force Officer and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7). I am, therefore, an officer who is empowered to conduct criminal investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

4. I have been employed as a Task Force Officer of the DEA since August 2011 and am currently assigned to the West Palm Beach, Florida, Resident Office. In addition to my assignment as a Task Force Officer with DEA, I am also employed as a Detective with the Jupiter Police Department, Criminal Investigations Division. I have been a sworn police officer for approximately

14 years. I hold an Associate Degree in Applied Science, Computer Engineering Technology, through the Stanly Community College, North Carolina. I am also a graduate of the Indian River State College, Police Academy.

5. During my career, I have conducted investigations and been instructed in techniques dealing with the unlawful distribution of narcotics, possession with intent to distribute controlled substances, use of communication facilities to conduct narcotics transactions, maintaining a place for purposes of manufacturing, distributing or using controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856. Through investigations and training, I have become familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics, the collection of money which represents the proceeds of narcotics trafficking, and money laundering.

## SYNTHETIC MARIJUANA

6. In 1984, John W. Huffman, an organic chemist at Clemson University, worked with the National Institute for Drug Abuse, developing synthesized analogues and metabolites of $\Delta 9$-tetrahydrocannabinol (THC), the active component of marijuana. Huffman was able to develop over 450 synthetic cannabinoid chemicals. These chemical compounds were used to research the effects of cannabinoids on the human body. In December 2008, members of a German Pharmaceutical company, THC Pharm, found these synthetic cannabinoids were being used in "Spice", a store bought herbal product popular among drug users. Such herbal products are generally known as synthetic marijuana.

7. Synthetic marijuana is believed to be produced by many different manufacturers, using many different brand names. One of the these brand names is "Mr. Nice Guy". Many different types of synthetic marijuana are sold under this brand. These types include "Relaxinol", and flavors such

as "Mango", "Blueberry", and "Strawberry". These products are packaged in professionally made, brightly colored one gram foil packs, about the size of an individual serving of sweetener. These products are readily available and may be purchased over the counter at many gas stations, convenience stores, and novelty stores (commonly referred to as "head shops"), as well as over the internet. The packages are usually marked as "incense" or "potpourri" and many packages are marked "not for human consumption", even though the products are not incense or potpourri but are intended to be consumed and used by humans in the same manner as marijuana. If fact, the product inside the packages closely resembles marijuana. It is believed that synthetic marijuana is manufactured by spraying synthetic cannabinoid chemicals onto herbs and letting the mixture dry.

8. In the last few years, the use and popularity of synthetic marijuana products has skyrocketed. This popularity can be attributed to several factors. First, users believe that because the products do not contain real marijuana they are legal. Second, the products are readily available at retail outlets. Third, the use of synthetic marijuana results in the a marijuana-like "high" but does not result in positive drug tests. In additional to synthetic marijuana, the popularity and availability of synthetic cocaine, usually marketed as bath salts, has also risen.

9. As the popularity of synthetic drugs has risen, so have the dangers associated with their use. Calls to poison control centers and emergency visits related to the use of the products has increased dramatically over the last several years. In response, numerous states, including Florida, have passed laws in an attempt to regulate the use and distribution of synthetic drugs. On March 1, 2011, the DEA placed an emergency ban on many synthetic drugs, including the synthetic cannabinoid JWH-018, which made JWH-018 a schedule I drug for one calendar year. This ban was then extended for an additional six months, to September 1, 2012. The DEA is currently working to permanently schedule JWH-018 as a schedule I drug. After the new state laws and the DEA

emergency ban went into effect, manufacturers of synthetic marijuana products began altering the chemical composition of their products to skirt the ban, generally by using other cannabinoids and analogues not specifically mentioned in the DEA ban or the legislation.

## RELEVANT FEDERAL STATUTES

10. In 1986, Congress amended the Controlled Substances Act, 21 U.S.C. §§ 801-971, by establishing federal prohibitions against drug trafficking in "controlled substance analogues." Enacted as part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, the Controlled Substance Analogue Enforcement Act of 1986, (CSAEA or Analogue Act) was designed to address "underground chemists who tinker with the molecular structure of controlled substances to create new drugs that are not scheduled." *United States v. Forbes*, 806 F. Supp. 232, 236 (D. Colo. 1992). Such new drugs are referred to as controlled substance "analogues."

11. The Analogue Act does not specifically list the chemicals and substances that are controlled substance analogues. *See United States v. Klecker*, 228 F. Supp. 2d 720, 726 (E.D. Va. 2002) ("The very purpose of the statute, which is to prevent development of new drugs by underground chemists attempting to create new drugs that are not scheduled, necessitates some elasticity and prevents a specific listing of chemical analogues."), *aff'd*, 348 F.3d 69 (4th Cir. 2003). "Given the creativity of amateur chemists, such a list might well be impossible to compile." *United States v. Hofstatter*, 8 F.3d 316, 322 (6th Cir. 1993). Instead, the Analogue Act sets forth a set of criteria to determine whether a "designer drug" is "substantially similar" to a controlled substance in terms of chemical structure or effect. If the drug meets the criteria, then the "designer drug" is deemed to be a controlled substance analogue.

12. More specifically, under the Controlled Substance Analogue Enforcement Act of 1986, a controlled substance analogue ("analogue") is a substance:

    a.    the chemical structure of which is substantially similar to the chemical structure of a controlled substance in Schedule I or II; and either

    b.    has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in Schedule I or II; or

    c.    with respect to a particular person, which such person represents has or intends for the substance to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in Schedule I or II.

21 U.S.C. § 802(32)(A)(i)-(iii).

13. When an analogue is intended for human consumption, the analogue is treated, for the purposes of any Federal law, as a Schedule I controlled substance. 21 U.S.C. § 813.

## FACTS ESTABLISHING PROBABLE CAUSE

14. On January 20, 2012, a DEA Confidential Source (hereinafter referred to as CS), made a consensually monitored and recorded telephone call to Joel LESTER. The first telephone call went unanswered and was sent to voicemail. The CS did not leave a message. Within a short time LESTER returned the telephone call and engaged in conversation with the CS regarding the sale of synthetic marijuana products. During the course of the conversation LESTER evidenced that he was aware the products were intended, and going to be used for, human consumption, by stating that the products could be smoked in a hookah type device.

15. On January 23, 2012, the aforementioned CS conducted a meeting with LESTER. The purpose of this meeting was to discuss the possibility of the CS purchasing synthetic marijuana products to resell at the CS's place of business. This meeting took place at a predetermined location in the 1200 block of South Military Trail, West Palm Beach, Florida. During the meeting LESTER told the CS that the CS was going to be very thankful because people were going to go crazy for the synthetic marijuana products. While they were conversing the CS asked LESTER how the product could be smoked and if it could be smoked in a hookah. LESTER responded that the products could be burned like incense and smoked. LESTER continued by telling the CS to pretend the products were "pot". LESTER stated that the product was essentially legal marijuana, with the same effects, however they would not show up on a drug test. LESTER even stated that the products could be eaten, and he had gotten, "really stoned", once while chewing the synthetic marijuana. While discussing the Relaxinol product LESTER advised that it would even give hallucinations. Before the meeting was concluded the CS did purchase $300 worth of synthetic marijuana products from LESTER. The products were in approximately 1 gram packs and listed as follows: 10 packs of Mr. Nice Guy (Mango), 10 packs of Mr. Nice Guy (Strawberry), 10 packs of Mr. Nice Guy (Relaxinol), 10 packs of Mary (Herbal Incense and Potpourri), and 10 packs of Afterlife (Blueberry). All synthetic marijuana products purchased from LESTER were delivered to the DEA Southeastern Laboratory for testing on January 23, 2012.

16. On February 3, 2012 I received a report from the Southeastern Laboratory regarding the synthetic marijuana products tested, which were acquired from Joel LESTER. According to the report, Senior Forensic Chemist Jeanette Perr analyzed the products and determined the samples provided of Mr. Nice Guy "Mango", Mr. Nice Guy "Strawberry", Mr. Nice Guy "Relaxinol", "Mary" and Afterlife "Blueberry" contained AM2201 and/or JWH-122. DEA chemists have

opined, to reasonable degree of scientific probability, that both AM-2201 and JWH-122 are analoguess of JWH-018, a Schedule I controlled substance, because AM-2201 and JWH-122 have a chemical structure similar to JWH-018 and effect the central nervous system in much the same way as JWH-018. See also 1-Pentyl1-3-(4-methyl-1-naphthoyl)indole (JWH-122) Analog Status, U.S. DEA (May 2011) and 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole (AM2201) Analog Status, U.S. DEA (May 2011).

## CONCLUSION

17. Based upon the foregoing, your affiant states that there is probable cause to believe that On or about January 23, 2012, in Palm Beach County, Florida, JOEL LESTER knowingly and intentionally distributing a mixture or substance containing AM2201 and JWH-122, considered controlled substance analogs of JWH-018 as defined in 21 U.S.C. § 802(32)(A), knowing that the substance was intended for human consumption as provided in 21 U.S.C. § 813, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Task Force Officer Eric Gilbert
Drug Enforcement Administration

Sworn to and subscribed to before me
this 30 day of March, 2012.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** Joel Lester

**Case No.:** 12-8122-AEV

Count #: 1

Possessing with intent to distribute a controlled substance analog.

21 U.S.C. § 841(a)(1), 21 U.S.C. § 813, 21 U.S.C. § 801(32)(A), 21 U.S.C. § 841(b)(1)(D)

\* **Max.Penalty:** 5 years imprisonment; 3 years supervised release; $250,000,000 fine.